**Vinod PATEL, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**Andrew H. PARNES and Stephen J. Scarborough, Defendants.**

**No. CV 07–05364 MMM (SHx).**

United States District Court, C.D. California.

May 19, 2008.

Darren J. Robbins, Susan G. Taylor, Coughlin Stoia Geller Rudman and Robbins, San Diego, CA, Joon M. Khang, Lee Hong Degerman Kang & Schmadeka, Sean Kennedy Collins, Coughlin Stoia Geller Rudman and Robbins, Los Angeles, CA, for Plaintiffs.

Kristopher Price Diulio, Matthew E. Lilly, Gibson Dunn & Crutcher LLP, Irvine, CA, for Defendants.

**ORDER GRANTING IN PART PLAINTIFFS' MOTION TO STRIKE; GRANTING DEFENDANTS' MOTIONS TO DISMISS**

MARGARET M. MORROW, District Judge.

This is a securities class action against defendants Andrew H. Parnes and Stephen J. Scarborough, two executives of Standard Pacific Corporation. Lead plaintiffs Pinellas Park Retirement System (General Employees), Plumbers Local No. 98 Defined Benefit Pension Fund, and City of Pontiac General Employees' Retirement System seek to represent all persons who purchased the publicly traded securities of Standard Pacific between October 27, 2005 and August 2, 2007 (the "class period"). Standard Pacific builds and sells single-family attached and detached homes in the United States and provides mortgage financing and title services to its home buyers through subsidiaries and joint ventures.

Plaintiffs allege that during the class period, defendants misrepresented Standard Pacific's ability to open new, successful communities at a rate necessary to support its financial projections; misled the public about the demand for Standard Pacific homes; and lied about the company's ability to continue its historically strong earnings growth beyond the start of the class period.[1] They contend that defendants' misrepresentations and omissions violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), and Rule 10b–5 of the regulations promulgated by the Securities and Exchange Commission ("SEC"). They further contend that defendant Parnes violated § 20A of the 1934 Act by selling his shares of Standard Pacific stock at market prices artificially inflated by non-disclosures and misrepresentations in the public statements issued by defendants during the class period.[2]

There are two motions currently before the court. Defendants have moved to dismiss the consolidated class action complaint

---

1. Consolidated Class Action Complaint ("Complaint"), ¶ 2.

2. *Id.,* ¶ 139.

on several bases. Defendants argues that the complaint fails to plead the alleged fraud with sufficient particularity, that it fails to satisfy the heightened requirements for pleading scienter under the Private Securities Litigation Reform Act ("PSLRA"), that it fails to plead loss causation, and that it fails to state a claim under § 20(a) and § 20A of the 1934 Act. Defendants also assert that the PSLRA's "safe harbor" for forward looking statements bars liability in this case.

In connection with their motion to dismiss, defendants ask the court to take judicial notice of numerous SEC filings, Standard Pacific press releases, news articles, and analyst reports. Plaintiffs have moved to strike various exhibits that are the subject of defendants' request for judicial notice, or in the alternative, to convert the motion to dismiss into a motion for summary judgment.

## I. FACTUAL BACKGROUND

In deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court's review is limited to the contents of the complaint. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir.1996). All allegations of material fact must be accepted as true and must be construed in the light most favorable to the non-moving party. *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir.1996). Accordingly, the court's statement of facts recites and accepts as true the allegations contained in the consolidated class action complaint.[3]

### A. Background

Standard Pacific builds and sells single-family attached and detached homes in the United States and provides mortgage financing and title services to its home buyers through subsidiaries and joint ventures.[4] It operates in 31 metro markets in California, Florida, Arizona, the Carolinas, Texas, Colorado, Nevada, and Illinois.[5] The company's product offerings range from homes under $100,000 to over $2,000,000. Its customers are first-time, move-up, and luxury home buyers.[6] Standard Pacific's stock trades on the New York Stock Exchange ("NYSE").[7] Defendant Scarborough is Chairman and CEO of Standard Pacific.[8] Defendant Parnes is CFO and Executive Vice President of Standard Pacific.[9]

Lead plaintiffs Pinellas Park Retirement System (General Employees) ("Pinellas Park") and Plumbers Local No. 98 Defined Benefit Pension Fund ("Plumbers Local No. 98 Fund") purchased the common stock of Standard Pacific during the class period.[10] They contend they purchased their shares at artificially inflated prices due to defendants' alleged misrepresentations about Standard Pacific's business and outlook for 2006 and 2007.[11] When truthful information was ultimately disclosed, plaintiffs assert, the company's stock price declined and they were damaged as a result.[12] Lead plaintiff City of Pontiac General Employees' Retirement System ("City of Pontiac") purchased Standard Pacific 9.25% notes due April 15, 2012, at allegedly artificially inflated prices during the class period.[13]

### B. Defendants' Activities During the Fourth Quarter of 2005

On October 27, 2005 (the first day of the proposed class period), Standard Pacific issued a press release announcing its financial results for the third quarter of 2005.[14] The

---

3. Plaintiffs' complaint comprises 73 pages and 145 numbered paragraphs.

4. Complaint, ¶ 1.

5. *Id.*

6. *Id.*

7. *Id.*

8. *Id.*, ¶ 24. In spring of 2007, Scarborough became president of the company as well. (*Id.*).

9. *Id.*, ¶ 25.

10. *Id.*, ¶¶ 21–22.

11. *Id.*

12. *Id.*

13. *Id.*, ¶ 23.

14. *Id.*, ¶ 29. As with several of the other releases they reference, plaintiffs offer lengthy quotations from this press release. (See Complaint at 10–

534

company reported net income for the third quarter of $96.4 million, or $1.37 per diluted share; this was an increase of 29% over the prior year.[15] Defendant Scarborough is quoted in the press release as stating that "the vast majority of the year-over-year increase in [Standard Pacific's] homebuilding profits came from markets outside of California," and that "[t]his trend underscores the success of ongoing efforts to geographically diversify the Company's operating platform."[16]

On October 28, 2005, defendants held a quarter-end conference call for analysts to discuss 3Q05 results and future prospects.[17] Scarborough and Parnes emphasized that Standard Pacific's record results reflected healthy market conditions in California, Florida, and Arizona, and noted in particular that deliveries were up in Arizona, "reflecting strong demand for new housing."[18] As in the press release, Scarborough stressed the company's efforts to diversify by expanding into new geographic markets, stating: "[W]e wouldn't be entering the markets if we felt like the fundamentals were not there."[19] In response to questions about Standard Pacific's growth projections, Scarborough asserted that the company had been "very appropriately conservative in [its] market assumptions."[20]

On November 3, 2005, Standard Pacific filed its 3Q05 Form 10–Q with the SEC.[21] The Form 10–Q reported Standard Pacific's net new orders and its backlog of homes for the third quarter of 2005.[22] The report stated: "Our outlook for 2005 reflects our strong operating results to date combined with our record backlog at September 30, 2005. Accordingly, based on these factors, combined

with our recent acquisitions and growing lot positions in our established markets, we are targeting 11,175 new home deliveries, excluding 275 joint venture deliveries, and homebuilding revenues of approximately $3.9 billion for 2005."[23]

On November 22, 2005, Scarborough announced that Standard Pacific had purchased 2,675 acres in North Las Vegas and would partner with various developers to build a master planned community that included 12,000 to 14,000 single family homes, townhomes, and apartments.[24] Standard Pacific reported that "[t]his significant land acquisition provides us with a strong foothold in the Las Vegas market, and firmly establishes our start-up operations there. It also supports our long-term strategy to deliberately expand our presence in Las Vegas, one of the largest and most dynamic markets in the country."[25] On November 30, 2005, Parnes made a presentation at the Friedman Billings Ramsey 2005 Investor Conference, where he stated that the company expected to post 15% earnings growth in 2006 by increasing its unit volume to make up for potentially moderating home prices and margins.[26]

Plaintiffs assert that these "positive statements assurances and forecasts" were materially false and misleading because "while Standard Pacific was aggressively expanding into [the] Phoenix, Florida and Las Vegas markets, claiming the healthy housing markets in those areas substantiated the projected increases for the remainder of 2005 and into 2006, those markets had already begun experiencing a slowing trend by August 2005 at the latest."[27] Plaintiffs dispute defendants' claim that its continued geographic

14). The court has endeavored to summarize the relevant points here.

15. *Id.*

16. *Id.,* ¶ 29.

17. *Id.,* ¶ 30.

18. *Id.*

19. *Id.*

20. *Id.*

21. *Id.,* ¶ 31. Scarborough and Parnes signed and certified the Form 10–Q pursuant to § 906 of the Sarbanes–Oxley Act of 2002. (*Id.*)

22. *Id.,* ¶ 32.

23. *Id.*

24. *Id.,* ¶ 36.

25. *Id.*

26. *Id.,* ¶ 37.

27. *Id.,* ¶ 33.

diversification placed it in a better position going forward because approximately 75% of the projected deliveries "came from these already overtapped regions." [28]

Additionally, according to Confidential Witness 1 ("CW1"), a former corporate administrator in the company's Irvine headquarters, Standard Pacific's sales projections at the end of 2005 had no reasonable basis.[29] CW1 states that Standard Pacific sales reports were prepared on a weekly basis using the sales data received from each of the company's individual divisions.[30] CW1 integrated the sales data into one weekly report that she distributed to Standard Pacific's controller, John Stephens, then-president Michael Cortney, and defendants Scarborough and Parnes.[31] These weekly sales reports contained not only various divisions' sales data, but also spreadsheets detailing land acquisitions, construction starts, completions, sales, and forecasts for each division detailing their sales projections through the end of the fiscal year.[32] The forecasting parts of the weekly reports were prepared using a "Cognos" software system, and were therefore referred to as the "Cognos Reports." Information from the weekly reports was used to produce monthly sales reports; data from the monthly sales reports went into the quarterly and year-end sales reports.[33] This information was also the basis for Standard Pacific's Forms 10–K and 10–Q, which were filed with the SEC.[34]

CW1 states that in December 2005, the company's sales data revealed that in 4Q05 some of the divisions had sales listed where no deposit had been received or no escrow had been opened.[35] CW1 investigated, and discovered that some of the sales projections were wholly unsupported, specifically those for San Antonio, Texas and Jacksonville, Florida, which included sales where escrows had been cancelled.[36]

## C. First Quarter 2006

On February 2, 2006, Standard Pacific issued a press release announcing its financial results for fourth quarter and year end 2005.[37] For the quarter, the company reported earnings per share of $2.22, and net income of $154.9 million.[38] Looking forward to 2006, Scarborough stated that Standard Pacific was "targeting 13,000 deliveries," and that its expectations for the year were "bolstered by [its] backlog of nearly 6,300 homes, valued at $2.3 billion, representing nearly 50% of [its] 2006 full year delivery projection, including at least 65% of [its] projected 2006 Arizona and Florida deliveries." [39] Scarborough also stated that Standard Pacific was "maintaining [its] earnings guidance [for 2006] at $6.90 per share, a 10% year-over-year increase. [It was] also providing initial earnings guidance for the first quarter of 2006 of $1.25 per share, up 6% from last year's first quarter earnings." [40]

On February 3, 2006, defendants held a quarter-end conference call with analysts to discuss 4Q05 results and future prospects.[41] Scarborough reiterated the statements he had made in the February 2 press release. Asked how Standard Pacific could reach its projected growth, given that it had experienced a negative percentage of closings in the fourth quarter of 2005, Scarborough affirmed the company's earnings guidance, noting that it would not need to make all of its

28. *Id.*

29. *Id.*

30. *Id.,* ¶ 4.

31. *Id.*

32. *Id.*

33. *Id.*

34. *Id.,* ¶ 5.

35. *Id.,* ¶ 6. Although not expressly stated, it appears that this was contrary to usual practice in which divisional sales projections were supported by deposits and open escrows.

36. *Id.*

37. *Id.,* ¶ 39.

38. *Id.*

39. *Id.*

40. *Id.*

41. *Id.,* ¶ 40.

projected sales in the first half of the year, but could "sell well into the third quarter, and close those units in the fourth quarter." [42]  Scarborough also stated: "[O]ur new openings are heavily planned for the first and second quarters, which we think will support sales activity and delivery projections, in line with what we need and what our business plan projects." [43]  Parnes added: "I think it progressively gets better through the year. I think the first quarter will probably be generally in line with last year's first quarter, and I think each quarter after that you should see better comps.  I think you'll see a decent comp in the second quarter, with it improving in the third and even better in the fourth." [44]

On February 24, 2006, Standard Pacific filed its 2005 Annual Report for the year ending December 31, 2005 with the SEC. [45] The Form 10–K reported to the investing public the outlook for 2006 as stated in the earlier press release and conference call. [46]

Plaintiffs contend that there was no reasonable basis for these projections.  They cite the statements of CW1, who reports that by January 2006, she was communicating with individual divisions regarding their early 2006 results, and discovered that actual sales were not in line with projections and that the housing market was softening in most Standard Pacific locations. [47]  These developments not only affected sales forecasts directly, but materially altered the reported backlog and expected cancellation rate that the market used as an indicator of the accuracy of defendants' earnings guidance. [48]  Additionally, according to Confidential Witness Two ("CW2"), a former vice president of operations, Standard Pacific commonly pushed December deliveries into January or pulled January closings into December in order to meet forecasts. [49]

## D.  Second Quarter 2006

On April 27, 2006, Standard Pacific issued a press release announcing its financial results for the first quarter of 2006. [50]  The company reported quarterly earnings per share of $1.38 and net income of $94.8 million. [51]  Scarborough stated that during the quarter, Standard Pacific had seen evidence that many of its housing markets were "moderating from the unsustainable pace of the past few years," because "[w]hile the dollar values of [its] orders were on par with last year's first quarter, [its] unit orders were down 8%." [52]  As a result, Standard Pacific adjusted its business plan for 2006 to respond to changing market conditions and to reflect its view "that the demand for new homes will adjust to more normalized and sustainable levels resulting in generally lower absorption rates on a project-by-project basis going forward." [53]  Scarborough noted, however, that "[a]t the same time, [the company] planned to open approximately 140–145 new projects during the year, up 55% over 2005, which should help drive a 35% year-over-year increase in [its] community count by the end of the year and support [its] deliveries for 2006 and 2007." [54]  In its initial guidance for the second quarter of 2006, Standard Pacific projected approximately 2,875 deliveries, excluding 55 joint venture homes, and homebuilding revenues of approximately $1,075 million;  it targeted earnings of $1.45 per share, [55] and expressed confidence in its long-term prospects given its "diversified base of

42.  *Id.*

43.  *Id.*

44.  *Id.*

45.  *Id.,* ¶ 41.

46.  *Id.,* ¶ 42.

47.  *Id.,* ¶ 6.

48.  *Id.*

49.  *Id.,* ¶ 43.

50.  *Id.,* ¶ 44.

51.  *Id.*

52.  *Id.*

53.  *Id.*

54.  *Id.*

55.  *Id.*

operations." [56]

On April 28, 2006, defendants held a quarter-end conference call for analysts to discuss 1Q06 results and guidance for 2006.[57] One analyst asked if Standard Pacific was concerned that it had "more new product coming online" in 2006 than its peers since "[m]any of them [were] already discounting and incentivizing aggressively in [Standard Pacific's] markets." [58] Scarborough responded that bringing new communities online was an advantage for Standard Pacific relative to other competitors.[59]

On May 8, 2006, Standard Pacific filed its 1Q06 Form 10–Q with the SEC, which reported that orders were down 9 percent in the Carolinas and that its cancellation rate for the first quarter of 2006 was 24 percent, up from the prior year's rate of 17 percent.[60] Based on its updated outlook, the company targeted "12,300 new home deliveries, excluding 475 joint venture deliveries, and homebuilding revenues of approximately $4.8 billion for 2006." In the day trading days following this announcement, shares of Standard Pacific stock fell $4.01 per share, or approximately 14%.[61]

Plaintiff asserts that defendants' positive statements, assurances, and forecasts during this period were materially false and misleading, in part, because by the second quarter of 2006, actual sales were "slowing to a trickle" in many Standard Pacific divisions.[62] In mid–2005, Standard Pacific had created a Central Valley [63] division to spearhead and track projected developments in that area. Confidential Witness 3 ("CW3"), a forward planner in the division, asserts that despite employee concerns that the Central Valley market had already slowed, Standard Pacific embarked on an expansion effort to build several new communities.[64] CW3 reports that in early 2006, defendants continued with their plan to acquire new land, ignoring the downhill market in the area at the time.[65]

In addition, CW1 maintains that, although the downturn in the real estate market was severe and very evident, Standard Pacific's projections for second quarter 2006 were "over-optimistic." [66] She estimates that Standard Pacific fell short of its projections by approximately 25% in 1Q06; nonetheless, it persisted in its 2Q06 projections despite diminishing back-up data supporting the numbers.[67] CW1 also contends that by early 2Q06, Scarborough and Parnes had begun to instruct divisions that their projections needed to be revised downward to reflect the softening market.[68] As a result, all division forecasts were reduced by approximately 20%.[69] CW1 asserts that this reduction was insufficient, as Standard Pacific was consistently at least 25% short of sales forecasts each week.[70] As 2006 progressed, the variance between actual and projected sales grew larger, to the point where the projections were likely 35% to 50% greater than what was supportable based on real data.[71] The complaint alleges that Scarborough and Parnes knew that the projections were artificially high and that Standard Pacific was consistently short of sales forecasts, but continued to re-publish the artificially high numbers derived from the weekly reports CW1 prepared.[72]

---

**56.** *Id.*

**57.** *Id.,* ¶ 45.

**58.** *Id.*

**59.** *Id.*

**60.** *Id.,* ¶¶ , 47–48.

**61.** *Id.,* ¶ 49.

**62.** *Id.,* ¶ 50.

**63.** The court presumes this refers to the Central Valley of California.

**64.** *Id.*

**65.** *Id.*

**66.** *Id.,* ¶ 50.

**67.** *Id.,* ¶ 9.

**68.** *Id.,* ¶ 7.

**69.** *Id.,* ¶ 50.

**70.** *Id.,* ¶¶ 9, 50.

**71.** *Id.,* ¶ 9.

**72.** *Id.,* ¶¶ 9, 50.

Plaintiffs also maintain that the slowdown in the market in early 2006 was further evident to defendants due to an abrupt decline in non-builder loans generated by Standard Pacific's Family Lending Services.[73] According to Confidential Witness 4 ("CW4"), a sales project analyst, loan sales dropped by 70% in 1Q06 and into 2Q06.[74] CW4 reports that as home sales declined during this period, Standard Pacific began to offer extra incentives to home purchasers, and also began to lay off both sales representatives and loan officers.[75]

On June 2, 2006, Standard Pacific issued a press release announcing its April and May 2006 order trends and lowering its earning guidance for the 2006 year.[76] The company noted that "net new home orders for the first two months of the 2006 second quarter were down 41% from the year earlier period, driven in large part by an increase in the Company's cancellation rate and continued softening of demand in many of the Company's larger markets." [77] The press release stated that, given the decreased order levels, "the Company expect[ed] to lower its earnings and delivery guidance for the full year and [would] provide the updated guidance in conjunction with its regularly scheduled earnings release at the end of July." [78]

### E. Third Quarter 2006

On July 27, 2006, Standard Pacific issued another press release announcing its financial results for the second quarter of 2006.[79] It reported quarterly earnings per share of $1.44 and net income of $96.5 million.[80] Noting the changing market conditions, Scarbor-

ough stated that the company had adjusted its business plan for 2006 "to respond to the[ ] challenging market conditions and to reflect ... [its] expectation of generally lower absorption rates on a project-by-project basis going forward." [81] Defendants projected approximately 10,400 deliveries, homebuilding revenues of approximately $4.0 billion, and earnings of $5.10 to $5.40 per share.[82]

On July 28, 2006, defendants held a quarter-end conference call with analysts.[83] Scarborough expressed continued optimism about Standard Pacific's performance in the San Antonio and Las Vegas markets.[84] He also answered questions regarding the fact that Standard Pacific's projections for under-construction units, spec units, and cancellation rates had been too high.[85] As respects upcoming orders, one analyst asked about an apparently surprising increase in the earnings guidance from the third to the fourth quarter.[86] Scarborough said such an increase was "not atypical," as the fourth quarter generally had the highest number of closings, and this would be true in 2006.[87] Parnes added that Standard Pacific believed it would have approximately 3,000 closings in the fourth quarter versus 2,275 in the third quarter.[88]

On August 4, 2006, Standard Pacific filed its 2Q06 Form 10–Q with the SEC.[89] The Form 10–Q reported that "[t]he changing market tone that surfaced at the end of 2005 ha[d] continued to evolve during the first half of 2006 and [was] negatively impacting most of [Standard Pacific's] major markets across

73. *Id.,* ¶ 50.

74. *Id.*

75. *Id.*

76. *Id.,* ¶ 51.

77. *Id.*

78. *Id.*

79. *Id.,* ¶ 52.

80. *Id.*

81. *Id.*

82. *Id.*

83. *Id.,* ¶ 53.

84. *Id.*

85. *Id.,* ¶ 54.

86. *Id.*

87. *Id.*

88. *Id.*

89. *Id.,* ¶ 55.

the country."[90]   It noted in particular that the cancellation rate for the second quarter was 36 percent, up from the prior year's rate of 15%, and that the rate was up meaningfully year-over-year in California, Florida, and Arizona.[91]

Plaintiffs assert that defendants' projections were false and misleading, as some Standard Pacific divisions were reporting negative sales.[92]   CW1 contends that cancellations had risen to alarming rates by June 2006, with some divisions reporting rates in the low double digits.[93]   She also states that during the second quarter of 2006, Standard Pacific's controller, Stephens, and Parnes hired an independent consulting firm to ascertain the true financial status of Standard Pacific's various divisions, as corporate officials were concerned about the reliability of the financial information being submitted by the divisions.[94]

Plaintiffs also allege that Standard Pacific had begun to experience a significant increase in cancellation rates in the Florida market.[95]   According to Confidential Witness 5 ("CW5"), a Florida area manager, the Florida market had been adversely affected by a severe hurricane season in 2005, as well as an extensive sinkhole problem, which caused insurance costs to rise significantly from 2005 to 2006.[96]   Standard Pacific was reportedly aware of the problem, as an increasing number of homeowners cancelled purchase contracts because it was too costly to insure the new properties.[97]   The cancellations were sufficiently numerous that the company considered offering greater incentives in certain communities located in and around Tampa, Florida, and abandoning plans for additional phases there.[98]   Standard Pacific's Miami operations also softened throughout the first half of 2006.   Confidential Witness 6 ("CW6"), a former construction supervisor, reports that by June and July 2006, construction had slowed to such an extent that significant layoffs were necessary.[99]   Standard Pacific attempted to abate the slowing market by offering $40,000 discounts on certain waterfront construction, but had to shut down construction at the project completely by July 2006.[100]

As further evidence that Standard Pacific's projections were misleading, plaintiffs state that the company knew that its massive investment in a Las Vegas joint venture was not going to yield the projected results.[101]   CW2 contends that as soon as the company opened models for visitors in June and July 2006, it became apparent that interest was low and sales would be low as well.[102]   CW2 asserts this was a clear indication that the development would not yield the sales needed to justify the large investment.

On September 8, 2006, Standard Pacific announced its July and August 2006 order trends,[103] and lowered its earnings guidance for the third quarter of 2006.   The company noted that net new home orders for the first two months of the third quarter were down 58% from the same period the prior year; it attributed this, "in large part[,][to] the continued increase in the Company's cancellation rate and further weakening of demand in many of the Company's larger markets."[104] Standard Pacific observed that orders were down meaningfully in Southern California, Northern California, Florida, and Arizona, but were up in Texas.[105]   It stated that, in

90.  *Id.,* ¶ 58.

91.  *Id.*

92.  *Id.,* ¶ 59.

93.  *Id.,* ¶ 60.

94.  *Id.,* ¶ 60.

95.  *Id.,* ¶ 62.

96.  *Id.*

97.  *Id.*

98.  *Id.*

99.  *Id.,* ¶ 63.

100.  *Id.*

101.  *Id.,* ¶ 64.

102.  *Id.*

103.  *Id.,* ¶ 65.

104.  *Id.*

105.  *Id.*

light of lower than expected order levels and deteriorating market conditions, it anticipated that third quarter earnings per share would be materially below its previous guidance.[106]

### F.  Fourth Quarter 2006

On October 26, 2006, Standard Pacific issued a press release announcing its financial results for the third quarter of 2006.[107]  It reported net income of $30.8 million, or $0.47 per diluted share.[108]  Scarborough commented on the results, stating: "Our financial operating results and new home order levels for the third quarter reflect the further weakening of demand for new homes in many markets.  Accordingly, we have adjusted our business plan for 2006 to reflect lower absorption rates and gross margins.  We are targeting approximately 10,200 to 10,300 deliveries, excluding 350 joint venture homes, homebuilding revenues of approximately $3.8 billion, and earnings of $4.20 to $4.30 per share."[109]  Following this announcement, the price of the company's stock fell $1.60 per share, or approximately 6%, on heavy trading volume.[110]

On October 27, 2006, defendants conducted a quarter-end conference call with analysts.[111]  When asked why Standard Pacific was continuing to open new communities, instead of holding onto land and waiting for a better time to sell, Scarborough said he was still optimistic about the company's new communities in Las Vegas, Dallas, and Austin.[112]  Addressing cancellations, Scarborough stated that most had been the result of buyers not being able to sell their houses in order to consummate a transaction with Standard Pacific, and not of their being lured away by other developers.[113]  Scarborough confirmed that, where possible, Standard Pacific was trying to negotiate with buyers to keep them in the backlog.

On November 3, 2006, Standard Pacific filed its 3Q06 Form 10–Q with the SEC.[114]  The Form 10–Q reported the same figures for targeted deliveries and homebuilding revenues as the October 26, 2006 press release.[115]  It also stated that Standard Pacific was "targeting approximately 220 communities by the end of 2006, representing a 22 percent year-over-year increase."[116]  Plaintiff maintains that defendants' forecasts continued to be false and misleading.  They allege that Standard Pacific's financial information and forecasts remained unreliable throughout this period because defendants refused to implement the changes suggested by the consulting company Standard Pacific had hired to review various aspects of its financials.[117]  CW1 reports that as a result of defendants' refusal to take corrective action, Standard Pacific's finance director decided to leave the company.[118]  Additionally, she asserts that the company's forecasts were inflated at least 25% over actual sales throughout 2006.[119]  Furthermore, as noted by CW5, the company was facing significant cancellations in Florida.[120]

On December 6, 2006, Parnes made a presentation at the New York Society of Security Analysts Homebuilding Conference.  He stated that the company was seeing order and cancellation trends improve during the fourth quarter of 2006.[121]

---

106.  *Id.*

107.  *Id.,* ¶ 66.

108.  *Id.*

109.  *Id.*

110.  *Id.,* ¶ 67.

111.  *Id.,* ¶ 68.

112.  *Id.*

113.  *Id.*

114.  *Id.,* ¶ 69.

115.  *Id.,* ¶ 72.

116.  *Id.*

117.  *Id.,* ¶ 73.

118.  *Id.*

119.  *Id.*

120.  *Id.,* ¶ 74.

121.  *Id.,* ¶ 75.

## G. First Quarter 2007

On February 1, 2007, Standard Pacific issued a press release announcing its financial results for fourth quarter and year end 2006.[122] For the quarter, it reported a loss per share of $1.53 and a net loss of $98.4 million.[123] Although acknowledging that results had fallen far short of expectations for the year, Scarborough noted that, "despite the normal seasonal slowdown at year-end," the company had "see[n] a modest increase in sales absorption rates and a decrease in cancellation rate[s] during the fourth quarter as compared to the 2006 third quarter."[124] He remarked that "[w]hile these improvements were clearly the result of adjustments to our pricing strategy, it does show that there is demand at the right price."[125] Nonetheless, Scarborough cautioned that "[b]ecause of the challenging market conditions we are currently facing, providing guidance for 2007 with any degree of certainty is difficult."[126] He stated that Standard Pacific's 2007 business plan reflected $3.2 to $3.3 billion in homebuilding revenues from approximately 8,700 new home deliveries, generating earnings of approximately $1.75 per share. For the first quarter of 2007, the company projected earnings of $0.25 per share from approximately 1,650 new homes and revenues of $600 million.[127] Scarborough offered this caveat:

"Our guidance for 2007 does not reflect additional inventory impairment charges or write-offs of land deposits and preacquisition costs for abandoned projects. If general or local market conditions deteriorate further, or our competitors change their pricing strategies, we may have to further reduce home prices or adjust our discounts and concessions which may, in turn, trigger additional impairments."[128]

On February 2, 2007, at a quarter-end conference call for analysts, Parnes stated that Standard Pacific's annual business plan was based on generating slightly more than 9,000 orders during 2007.[129] He noted that Standard Pacific had seen an improvement in its absorption rates and a decrease in cancellation rates as a result of a change in pricing strategy.[130]

On February 23, 2007, Standard Pacific filed its Form 10–K for the year ending December 31, 2006.[131] The Form 10–K reported that the "current 2007 business plan reflects $3.2 to $3.3 billion in homebuilding revenues from approximately 8,700 new home deliveries (excluding 800 to 850 joint venture deliveries)."[132]

Plaintiffs assert that, despite its more measured projections, Standard Pacific's forecasts during this period were false and misleading. They emphasize that defendants continued to offer inflated sales forecasts to the investing public because the Cognos sales reports on which they were based were materially misleading.[133] Moreover, plaintiffs contend, the statements regarding increased absorption rates were materially false and misleading, as Standard Pacific was dumping homes at cost.[134] According to Confidential Witness 7 ("CW7"), a former purchasing director in the San Antonio division, Standard Pacific management in Irvine had told the senior management of the San Antonio division that corporate did not care whether San Antonio made a profit so long as it sold lots, because the company needed the cash.[135] CW7 reports that the purchase price of

122. *Id.,* ¶ 76.

123. *Id.*

124. *Id.*

125. *Id.*

126. *Id.*

127. *Id.*

128. *Id.*

129. *Id.,* ¶ 77.

130. *Id.*

131. *Id.,* ¶ 79.

132. *Id.*

133. *Id.,* ¶ 80.

134. *Id.,* ¶ 81.

135. *Id.*

homes in San Antonio was being slashed $50,000 to $80,000 to sell the lots.[136]

## H. Second Quarter 2007

On April 26, 2007, Standard Pacific issued a press release announcing its financial results for the first quarter of 2007. It reported a loss per share of $0.63, with a net loss of $40.8 million for the quarter.[137] The company also reported a non-cash pretax impairment charge of $130.2 million, or $1.25 per diluted share after tax; of this, $86.1 million was attributable to consolidated real estate inventories, while $44.1 million was due to the company's share of joint venture inventory impairment charges.[138] Scarborough stated that Standard Pacific projected approximately 1,565 new home deliveries for the 2007 second quarter, with homebuilding revenues of $560 million.[139] Following this announcement, shares of the company's stock fell approximately 6%.

On April 27, 2007, defendants conducted a conference call with analysts. Although questioned about Standard Pacific's ability to meet its target of 8,150 deliveries in 2007, Scarborough and Parnes stood by the projection.[140]

On May 9, 2007, Standard Pacific filed its 1Q07 Form 10–Q with the SEC.[141] The Form 10–Q reported decreases in net new orders and backlog from the first quarter of 2006.[142] It stated that the company anticipated opening approximately 105 new communities during 2007 compared with 88 in 2006,[143] and targeted approximately 260 new communities by the end of 2007, representing a 25% year-over-year increase.[144]

On June 11, 2007, Standard Pacific issued a press release announcing April and May 2007 order trends.[145] Overall, net new home orders for those months were down 16% from the prior year, and nearly 20% below the company's business plan for the two-month period.[146] The overall decrease in orders was driven by continued weakness in the Florida and Arizona markets. Orders were flat in the Carolinas, down in Texas, and up more than 13% year-over-year in California.[147] Following this announcement, shares of the company's stock fell approximately 5% to a four-year low.[148]

On June 14, 2007, Scarborough spoke at the Bank of America 2007 Homebuilders Conference. He stated that Standard Pacific had seen some stabilization in certain California markets, and that it would be able to generate some reasonable sales in those markets.[149] Scarborough continued to project 100 new communities going forward. Asked about Standard Pacific's entry into the Nevada market given the housing slowdown there, Scarborough said that the company saw Law Vegas "as a good market for us going forward." [150]

Plaintiffs contend that the positive projections offered during this period were false and misleading, given that sales in various markets were not stabilizing as defendants represented.[151] Confidential Witness 8 ("CW8"), a former sales representative from California, states that defendants offered massive incentives in late 2006 in communities in the Inland Empire and throughout California to try to move inventory.[152] The incentives were eliminated for a short time in

136. *Id.*

137. *Id.,* ¶ 82.

138. *Id.*

139. *Id.*

140. *Id.,* ¶ 84.

141. *Id.,* ¶ 85.

142. *Id.,* ¶¶ 86–87.

143. *Id.,* ¶ 88.

144. *Id.*

145. *Id.,* ¶ 90.

146. *Id.*

147. *Id.*

148. *Id.,* ¶ 91.

149. *Id.,* ¶ 92.

150. *Id.*

151. *Id.,* ¶ 89.

152. *Id.*

early 2007, but were reinstituted by the end of the first quarter when sales again stalled. CW2 confirms that the Las Vegas market was not a good market for Standard Pacific, as the "lack of large numbers in sales in Standard Pacific's huge Las Vegas development was devastating" to the company.[153] Confidential Witness 9 ("CW9") and Confidential Witness 10 ("CW10"), both former accounts payable employees, report that decreased orders and sales were prevalent throughout Florida through the beginning of 2007.[154] They state that there was a direct link between the reduced number of third-party contractor bills Standard Pacific received and the decline in orders for new construction. CW9 asserts that defendants began layoffs in the Tampa office in January 2007, but failed to report this development to the market.[155]

## I. Third Quarter 2007

On July 26, 2007, Standard Pacific issued a press release announcing financial results for the second quarter of 2007. The company reported a loss per share of $2.56 and a net loss of $165.9 million.[156] It also reported a non-cash pretax impairment charge of $306 million, or $2.91 per diluted share after tax. Of this amount, $223.2 million was attributable to consolidated real estate inventories, $48.1 million to the company's share of joint venture inventory impairment charges, $5.3 million to land deposit write-offs, and $29.4 million to goodwill impairments.[157] In the press release, Scarborough stated that Standard Pacific would no longer provide earnings or operational guidance; he withdrew the company's prior guidance, including guidance respecting 2007 deliveries, revenues, and margins.[158]

On August 2, 2007, the company filed its 2Q07 Form 10–Q with the SEC, which reiterated that due to "challenging market conditions and the generally unpredictable nature of the current housing market," the company would no longer provide guidance regarding earnings and operations; the Form 10–Q also stated that Standard Pacific was withdrawing its prior guidance.[159] Upon market concerns that Standard Pacific would not be able to cover its debt, shares of the company's stock fell $3.76 per share, or approximately 30%, on August 3 and 6, 2007.[160]

On September 24, 2007, the company issued a press release announcing that it would eliminate its quarterly cash dividend and borrow more money by offering $100 million in convertible senior subordinated notes due in 2012.[161] In the two days following this announcement, shares of the company's stock fell $1.83 per share, or approximately 24%, on heavy trading volume.[162]

## J. Parnes' Alleged Insider Trading

During the class period, defendants and other company insiders sold 145,350 shares of personally-held Standard Pacific stock, grossing more than $4 million.[163] Parnes sold 45,250 shares of Standard Pacific stock between November 21, 2005 and November 30, 2006, netting proceeds of $1,194,034.[164]

## K. The Litigation

On August 16, 2007, Vinod Patel commenced this action against Parnes. On October 19, 2007, Pinellas Park, Plumbers Local No. 98 Fund, and City of Pontiac filed a motion for appointment as lead plaintiffs and approval of selection of lead counsel. Defendant did not oppose the motion, which the court granted on December 3, 2007. On January 23, 2008, lead plaintiffs filed a con-

153. *Id.*

154. *Id.*

155. *Id.*

156. *Id.,* ¶ 94.

157. *Id.*

158. *Id.*

159. *Id.,* ¶¶ 97–98.

160. *Id.,* ¶ 99.

161. *Id.,* ¶ 100.

162. *Id.,* ¶ 101.

163. *Id.,* ¶ 112.

164. *Id.*

solidated class action complaint, adding Scarborough as a defendant. Defendants moved to dismiss on March 10, 2008. Plaintiffs filed a motion to strike defendants' request for judicial notice or, in the alternative, to convert defendants' motion to a motion for summary judgment on April 8, 2008.

## II. DISCUSSION

### A. Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988). In deciding a Rule 12(b)(6), the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.,* 284 F.3d 977, 980 (9th Cir.2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1989).

The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.,* 80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens,* 57 F.3d 747, 750 (9th Cir.1995); see also *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007) ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true"). It need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ——, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)).

Because Rule 12(b)(6) review is confined to the complaint, the court may not consider material outside the pleading (e.g., facts presented in briefs, affidavits, or discovery materials). *In re American Continental Corp./Lincoln Savings & Loan Securities Litigation,* 102 F.3d 1524, 1537 (9th Cir. 1996). It may, however, properly consider exhibits submitted with the complaint, documents whose contents are alleged in the complaint when their authenticity is not questioned, and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *Hal Roach Studios, Inc.,* 896 F.2d at 1555 n. 19; *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994), cert. denied, 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994), overruled on other grounds by *Galbraith v. County of Santa Clara,* 307 F.3d 1119 (9th Cir.2002); see also *Tellabs,* 127 S.Ct. at 2509 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").[165] The court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing Inc.,* 143 F.3d 1293, 1295 (9th Cir.1998).

### B. Defendants' Request For Judicial Notice

Defendants ask that the court take judicial notice of various documents. Under the Federal Rules of Evidence, courts can judicially notice facts that are not subject to

---

**165.** Taking judicial notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment. *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986).

reasonable dispute, either because they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed.R.Evid. 201. Facts subject to judicial notice may be considered in ruling on a motion to dismiss. See *Mullis v. U.S. Bankruptcy Court, Dist. of Nevada,* 828 F.2d 1385, 1388 (9th Cir.1987) (citing *Mack v. South Bay Beer Distrib., Inc.,* 798 F.2d 1279, 1282 (9th Cir.1986)). As noted, " 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may [also] be considered in ruling on a Rule 12(b)(6) motion to dismiss.' " *In re Stac Electronics Securities Litigation,* 89 F.3d 1399, 1405, n. 4 (9th Cir.1996) (quoting *Fecht v. The Price Co.,* 70 F.3d 1078, 1080 n. 1 (9th Cir.1995)).

### 1. Standard Pacific's SEC Filings

#### a. Forms 10–K, 10–Q, 8–K

Defendants seek judicial notice of various Standard Pacific SEC filings referenced in plaintiffs' complaint, such as the Forms 10–K, 10–Q, and 8–K.[166] Courts may consider securities offering and corporate disclosure documents referenced in a complaint. See *In re Stac Electronics Securities Litigation,* 89 F.3d at 1405 n. 4 (discussing securities offering documents); *Fecht,* 70 F.3d at 1080 n. 1 ("Defendants attached to their motion to dismiss the full text of the Company's corporate disclosure documents and the securities analysts' reports quoted in the Complaint. Plaintiffs argue that because the district court considered the full text of these documents—many portions of which were not pleaded in the Complaint—defendants' motion to dismiss should have been converted into a motion for summary judgment, affording plaintiffs the opportunity to present additional evidentiary materials. This argument is foreclosed by *Branch v. Tunnell,* 14 F.3d 449 (9th Cir.), cert. denied, 512 U.S. 1219,

114 S.Ct. 2704, 129 L.Ed.2d 832 . . . (1994), in which we stated: 'As it makes sense and comports with existing practice, we hold that documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss. Such consideration does 'not convert the motion to dismiss into a motion for summary judgment,' " quoting *Branch,* 14 F.3d at 454 (quoting *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 n. 3 (1st Cir.1991))); see also *In re Silicon Graphics, Inc. Securities Litigation,* 183 F.3d 970, 986 (9th Cir. 1999) (holding that it was proper for the district court to consider SEC filings under the incorporation by reference doctrine described in *Branch* because their contents were alleged in the complaint).

As these SEC filings are referenced in the complaint and plaintiffs do not object, the court will consider Standard Pacific's Forms 10–K, 10–Q, and 8–K.

#### b. Forms 4

Defendants also ask that the court take judicial notice of various SEC Forms 4, which concern Parnes' individual trading activity during the class period and the year prior to commencement of the class period.[167] Defendants argue that it is proper to take judicial notice of these filings under the incorporation by reference doctrine because, although not explicitly referenced in the complaint, plaintiffs necessarily had to refer to publicly filed SEC Forms 4 or other SEC filings to identify Parnes' stock holdings and sales, and allege that he engaged in insider trading.[168] See *In re Hansen Natural Corp. Securities Litig.,* 527 F.Supp.2d 1142, 1150 n. 2 (C.D.Cal.2007) (taking judicial notice of several Forms 4 filed during the class period and referenced in the complaint); *In re Openwave Systems Inc. Shareholder Derivative Litig.,* 503 F.Supp.2d 1341, 1349–50 (N.D.Cal.2007) (taking judicial notice of defendants' Forms 4 for the purpose of deter-

---

**166.** Defendants' Request for Judicial Notice ("Def.'s RJN") at 5–6.

**167.** *Id.* at 2–3.

**168.** Defendants' Opposition to Plaintiffs' Motion to Strike or, in the Alternative, to Convert Defendants' Motion to Dismiss Into a Motion for Summary Judgment ("Def.'s RJN Opp.") at 9–10.

mining what they disclosed to the SEC); *Morgan v. AXT, Inc.,* Nos. C 04–4362 MJJ, C 05–5106 MJJ, 2005 WL 2347125, *7 (N.D.Cal. Sept. 23, 2005) (taking judicial notice of SEC Forms 4 even though they were not expressly referenced in the complaint); *Wietschner v. Monterey Pasta Co.,* 294 F.Supp.2d 1102, 1109 (N.D.Cal.2003) (taking judicial notice of SEC Forms 4 not explicitly referenced in the complaint because the filings were "integral to the stock sale allegations made in the Complaint").

Plaintiffs oppose this request [169] insofar as defendants offer the documents to provide a complete picture of defendants' trading activity "as opposed to the misleading picture presented by Plaintiffs' Complaint." [170] Plaintiffs assert that defendants ask the court to accept as true the content of the documents and to compare that content with the allegations in their complaint "in order to come to a factual conclusion regarding the level and potential meaning of defendants' stock transactions during the class period." [171]

It is appropriate for the court to take judicial notice of the content of the SEC Forms 4 and the fact that they were filed with the agency. The truth of the content, and the inferences properly drawn from them, however, is not a proper subject of judicial notice under Rule 201. See *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996) ("When deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC. Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents," citing *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1354–55 (7th Cir.1995) (holding that the district court properly re-

fused to take judicial notice of a corporation's Form 10–K to determine a fact in dispute— the number of corporate employees)); *In re Foundry Networks, Inc.,* C 00–4823 MMC, 2003 WL 23211577, *10 n. 11 (N.D.Cal. Feb. 14, 2003) ("Defendants have filed a Request for Judicial Notice, wherein they seek judicial notice of (1) two Foundry press releases, (2) SEC Forms 4 filed by Foundry's officers, and (3) Foundry's SEC Forms 10–K and 10–Q filings. Plaintiffs 'object to the request to the extent defendants seek to establish the truth of the contents in the noticed documents,' but raise no objection to the extent the request asks the Court to take notice of the contents of the documents. Defendants' request is hereby GRANTED to the extent it requests that the Court take judicial notice of the content of such documents"); see also *CPI Advanced, Inc. v. Kong Byung Woo Comm. Ind., Co., Ltd.,* 135 Fed.Appx. 81, 83 (9th Cir. June 16, 2005) (Unpub.Disp.) ("Though records of litigation are subject to judicial notice for some purposes at the pleading stage, judicial notice is not a proper basis for rejecting factual allegations appearing in the plaintiff's complaint," citing *Sears, Roebuck & Co. v. Metropolitan Engravers, Ltd.,* 245 F.2d 67, 70 (9th Cir.1956)); *Del Puerto Water Dist. v. U.S. Bureau of Reclamation,* 271 F.Supp.2d 1224, 1234 (E.D.Cal. 2003) ("Judicial Notice is taken of the existence and authenticity of the public and quasi public documents listed. To the extent their contents are in dispute, such matters of controversy are not appropriate subjects for judicial notice").

Therefore, the court will take judicial notice of the Standard Pacific Forms 4 filed with the SEC, but only to the extent defendants ask that it judicially notice the content of the documents and the fact of their filing.

### 2. Press Releases

Defendants next request that the court take judicial notice of Standard Pacific press

---

**169.** Lead Plaintiffs' Memorandum of Points and Authorities in Support of Motion to Strike or, in the Alternative, to Convert Defendants' Motion to Dismiss Into a Motion for Summary Judgment ("Pl.'s RJN Mot.") at 7.

**170.** Def.'s RJN Opp. at 10.

**171.** Reply Memorandum of Points and Authorities in Support of Lead Plaintiffs' Motion to Strike or, in the Alternative, to Convert Defendants' Motion to Dismiss Into a Motion for Summary Judgment ("Pl.'s RJN Reply") at 6.

releases issued on June 2, 2006, September 8, 2006, and June 11, 2007.[172] They assert that these press releases are a proper subject of judicial notice because they are publicly available and readily accessible on Standard Pacific's website.[173] This, defendants contend, makes them "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." FED.R.EVID. 201; *In re White Electronic Designs Corp. Sec. Lit.*, 416 F.Supp.2d 754, 760 (D.Ariz.2006) ("[J]udicial notice is appropriate for SEC filings, press releases, and accounting rules as they are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned" (internal quotations and citations omitted)). Defendants note that courts in the Ninth Circuit routinely grant judicial notice of press releases.[174] See, e.g., *In re Netflix, Inc. Securities Litig.*, Nos. C 04–2978 WHA, C 04–3021, C 04–3204, C 04–3233, C 04–3329, C 04–3770, C 04–3801, 2005 WL 3096209, *1 (N.D.Cal. Nov. 18, 2005); *In re Ligand Pharmaceuticals, Inc. Securities Litig.*, CV 04–1620 DMS LSP, 2005 WL 2461151, *2 n. 1 (S.D.Cal. Sept. 27, 2005); *In re Homestore.com. Inc. Sec. Litig.*, 347 F.Supp.2d 814, 816–17 (C.D.Cal.2004) (stating court may take judicial notice of press releases).

As plaintiffs have referenced these particular press releases in their complaint, moreover, they may considered under the "incorporation by reference" doctrine described in *Branch*, 14 F.3d at 454. Cf., e.g., *Morgan*, 2005 WL 2347125 at *7 (considering press releases referenced in plaintiff's complaint); *Wietschner*, 294 F.Supp.2d at 1108–09 (same). Plaintiffs do not object to defendants' request, and the court will consider the Standard Pacific press releases as a result.

### 3. Conference Call Transcripts

Because the complaint quotes from various Standard Pacific conference call transcripts, defendants ask the court to take judicial notice of full transcripts of the calls, to provide the full context in which the information was disclosed to the market.[175] Plaintiffs do not object to the request, and courts have, as noted, considered documents that are related to matters referenced in the complaint. See *In re Gilead Sciences Securities Litig.*, C 03–4999 MJJ, 2005 WL 181885, *4 (N.D.Cal. Jan. 26, 2005) ("The Court can take judicial notice of Exhibit D because 'the Court may take judicial notice of documents on which allegations in the [complaint] necessarily rely, even if not expressly referenced in the [complaint], provided the authenticity of those documents is not in dispute.' *In re Calpine Corp. Sec. Litig.*, 288 F.Supp.2d 1054, 1076 (N.D.Cal.2003). Plaintiffs necessarily rely upon this conference call because they claim that Defendants perpetuated a fraud on the market with the July 31, 2003 financial announcement and estimated inventory build-up. Therefore, the statements made in the conference call directly relate to the claim of fraud on the market and the transcript reflects information available to the market at the time"); *In re Northpoint Communications Group, Inc. Securities Litig.*, 184 F.Supp.2d 991, 994 n. 1 (N.D.Cal. 2001) ("In a securities-fraud suit, judicial notice can be had of documents directly related to documents referenced in the complaint that bear on the adequacy of the disclosure" (citations omitted)). The court will therefore consider the transcripts of Standard Pacific's earnings conference calls on October 28, 2005, February 3, 2006, April 28, 2006, July 28, 2006, October 27, 2006, February 2, 2007, and April 27, 2007.[176]

### 4. Standard Pacific Stock Prices

Defendants also request that the court take judicial notice of Standard Pacific's historical stock prices.[177] It argues that a district court ruling on a motion to dismiss in a securities fraud case may judicially notice the price of publicly traded stocks on particular

---

172. Def.'s RJN at 7.

173. *Id.*

174. *Id.*

175. *Id.* at 8.

176. See *id.* at 3.

177. *Id.* at 10.

dates. See *In re Copper Mountain Securities Litig.*, 311 F.Supp.2d 857, 864 (N.D.Cal. 2004) ("Information about the stock price of publicly traded companies [is] the proper subject of judicial notice," citing *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n. 8 (2d Cir.2000)); *In re Homestore.com, Inc. Securities Litig.*, 347 F.Supp.2d at 816 ("[A] court may take judicial notice of a company's published stock prices," citing *McMichael v. U.S. Filter Corp.*, 2001 WL 418981, *8 (C.D.Cal. Feb. 23, 2001); *Plevy v. Haggerty*, 38 F.Supp.2d 816, 821 (C.D.Cal.1998); and *Grimes v. Navigant Consulting, Inc.*, 185 F.Supp.2d 906, 913 (N.D.Ill.2002)). As plaintiffs do not oppose this request, and Standard Pacific's historical stock prices are publicity available and "capable of accurate and ready determination," the court grants defendants' request for judicial notice. See Fed.R.Evid. 201.

### 5. Analyst Reports

Defendants seek to have the court take judicial notice of numerous analyst reports concerning Standard Pacific that were issued between June 14, 2005 and March 22, 2007.[178] They offer the reports to show "whether and when information was provided to the market" regarding the company.[179] Plaintiffs oppose the request, arguing that their complaint does not reference, rely upon, or incorporate these reports.[180] Furthermore, plaintiffs contend, defendants do not seek to use the reports to show when certain statements were provided to the market, but to "create their own set of facts and urge the Court to accept these facts as evidence that Lead Plaintiffs' allegations cannot be true."[181]

While the court agrees with plaintiffs that the analyst reports may not be judicially noticed for the truth of the matters contained therein, it is appropriate to consider them for the purpose for which defendants offer them—i.e., to show "whether and when information was provided to the market." As defendants note, in determining whether their alleged misrepresentations and omissions were material, " 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); see also *California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126, 169 (3d Cir. 2004) (considering analysts' reports as part of the "total mix" of information available to a reasonable shareholder deciding how to vote); *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 490 F.Supp.2d 784, 808 (S.D.Tex.2007) ("Plaintiffs have also alleged that the analysts' reports were part of the total mix of information upon which Plaintiffs based their investment decisions").

Moreover, although plaintiffs do not directly cite a particular analysts' report, they allege that "Standard Pacific was followed by securities analysts from several major brokerages, including Wachovia, Deutsche Bank and A.G. Edwards, who wrote reports that were redistributed to certain customers of such firms and were available through various automated data retrieval services."[182] The court therefore grants defendants' request, and will take judicial notice of the content of the reports and the date they were disclosed to the market. See *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 976 (9th Cir.1999) ("It is undisputed that Ford's tax strategy was part of the total mix of market information prior to Heliotrope's purchases of Series A and Series B Preferred Stock. Ford introduced numerous financial analyst reports and news articles showing that FHI was formed at least in part for tax purposes. Because Ford's tax strategy was part of the total mix of information reflected in the price of FHI Preferred Stock at the time Heliotrope purchased its shares, Heliotrope cannot prove that Ford's

---

**178.** Def.'s RJN at 9.

**179.** *Id.*

**180.** Pl.'s RJN Reply at 2–3.

**181.** *Id.* at 4.

**182.** Complaint, ¶ 117(d).

failure to disclose its tax strategy caused Heliotrope any loss") (internal citations omitted); *In re Amgen Inc. Securities Litig.*, 544 F.Supp.2d 1009, 1023 (C.D.Cal.2008) ("Among the public documents a court may consider in a motion to dismiss securities fraud claims are analyst reports when they are submitted to establish 'whether and when certain information was provided to the market,' not the truth of the matters asserted in the reports. Because Plaintiffs do not dispute the authenticity of the analysts' reports, the Court grants Defendants' request to take judicial notice of Exhibit 8, to the extent the document is admissible," quoting *In re PetSmart, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 987 n. 1 (D.Ariz.1999)); *In re Infonet Services Corp. Securities Litig.*, 310 F.Supp.2d 1106, 1116 (C.D.Cal.2003) (taking judicial notice of analyst reports to establish when plaintiff had knowledge of claims and whether those claims were barred by the statute of limitations).

### 6. News Articles and FDIC Paper

Defendants next request judicial notice of various news articles regarding the housing market published during the class period.[183] Only two of the eleven articles offered by defendants relate directly to Standard Pacific.[184] It is appropriate for the court to take judicial notice of news articles regarding defendants' stock or corporate activities. See *Heliotrope General, Inc.*, 189 F.3d at 981 n. 18 (citing *Basic*, 485 U.S. at 244–47, 108 S.Ct. 978). The court declines, however, to take judicial notice of articles that do not pertain directly to Standard Pacific. The numerous cases that discuss news articles as part of the "total mix" of information available to investors address only articles about the defendant's activities and performance, not articles about an industry as a whole. See, e.g., *In re Yukos Oil Co. Securities Litig.*, Civ 04–5243 WHP, 2006 WL 3026024, \*21 (S.D.N.Y. Oct. 25, 2006) (noting in the context of a motion to dismiss that "[t]o the extent Plaintiffs allege that Yukos failed to disclose that Khodorkovsky was politically active, such a non-disclosure, even if true, was immaterial

in light of the wealth of publicly available information to that effect. In fact, the newspapers were saturated with references to Khodorkovsky's pro-Yeltsin, anti-Putin proclivity. Thus, even if Yukos failed to make that fact explicit, no reasonable juror could find 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the "total mix" of information made available,'" quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002), and citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir.2000) (holding that a misstatement or omission is not material if the undisclosed fact is already in the public domain); *White v. H & R Block, Inc.*, Civ. 02–8965 MBM, 2004 WL 1698628, \*12 (S.D.N.Y. July 28, 2004) (dismissing claims because the allegedly omitted fact was disclosed in the press)); *Smith v. Circuit City Stores, Inc.*, 286 F.Supp.2d 707, 721 (E.D.Va. 2003) (considering news articles directly related to the defendant and observing that "[d]isclosure of information already publicly available does not materially alter the 'total mix' of available information," citing *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262–63 (4th Cir.1993) (disclosure of company's fiscal problems by third parties in newspaper articles and analyst's reports "more than cured any omission by [the company]")); *In re Integrated Resources Real Estate Ltd. Partnerships Securities Litig.*, 815 F.Supp. 620, 640 (S.D.N.Y.1993) (describing *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F.Supp. 976, 987–88 (S.D.N.Y.1989), where court determined that defendants' alleged omissions were not material given that "the disclosure of the omitted information would not have affected the 'total mix' of available information because plaintiffs already should have known of such matters from general publicity accorded Federated in the media. There, over sixty newspaper articles and financial reports in the general press and financial community had identified Federated as an 'attractive' takeover candidate and had outlined the negative effect of takeovers on investment grade securities,

---

**183.** Def.'s RJN at 10.

**184.** *Id.*, Exhs. KKK, OOO.

such as the notes in which plaintiffs subsequently invested").

Consequently, in deciding the motion to dismiss, the court will take judicial notice of Exhibits KKK and OOO—the two news articles referencing Standard Pacific—but not of the remaining articles that concern the general housing market. The court grants plaintiffs' request to strike these portions of defendants' request for judicial notice.

### C. Defendants' Motion to Dismiss— Pleading Standards

#### 1. Rule 9(b) of the Federal Rules of Civil Procedure

Rule 9(b) of the Federal Rules of Civil Procedure provides that the "circumstances constituting fraud or mistake shall be stated with particularity." FED.R.CIV.PROC. 9(b). A securities fraud claim cannot survive a motion to dismiss under this rule merely by identifying an allegedly fraudulent statement made by defendants. *In re GlenFed, Inc. Securities Litigation,* 42 F.3d 1541, 1548 (9th Cir.1994) (en banc). Rather, the complaint must allege "why the disputed statement was untrue or misleading *when made."* *Id.* at 1549 (emphasis added). This requires that plaintiffs allege inconsistent contemporaneous statements and/or information known to defendants at the time the statement was made that demonstrate its falsity. *Id.* at 1548 ("[O]ur cases have consistently required that circumstances indicating falseness be set forth").

#### 2. The Private Securities Litigation Reform Act

In 1995, Congress passed the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4, which amended the Securities Exchange Act of 1934. The PSLRA modifies Rule 9(b)'s particularity requirement, "providing that a securities fraud complaint shall

identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." *Silicon Graphics,* 183 F.3d at 996; 15 U.S.C. § 78u–4(b)(1). The statute mandates that in alleging that each allegedly misleading statement or omission was made with scienter, plaintiff "state with particularity . . . facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). If the complaint does not contain such allegations, it must be dismissed. 15 U.S.C. § 78u4(b)(3)(A).[185]

As the *Silicon Graphics* court stated, in enacting the PSLRA, "Congress intended to elevate the pleading requirement[s]" that previously applied to securities fraud complaints. *Silicon Graphics,* 183 F.3d at 974; see also *Tellabs,* 127 S.Ct. at 2508 (describing the new procedures and new pleading standards set forth in PSLRA). Following the PSLRA, it is no longer sufficient to plead "facts showing simple recklessness or a motive to commit fraud and opportunity to do so." *Id.* Rather, "a private securities plaintiff proceeding under the PSLRA must plead in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Id.* While the standard used in judging motions under Rule 12(b)(6) has not changed, it is clear that a securities fraud claim must meet the more stringent pleading requirements established by the PSLRA to avoid dismissal.

### D. Sufficiency of Count I: Violation of Section 10(b) of the 1934 Act and Rule 10b–5

#### 1. Legal Standards Governing Section 10(b) and Rule 10b–5

Rule 10b–5, promulgated by the Securities and Exchange Commission pursuant to Section 10(b) of the 1934 Act, makes it unlawful for any person to use "manipulative or decep-

---

**185.** The PSLRA creates a "safe harbor" for "forward-looking" statements that are immaterial, are limited by "meaningful cautionary statements," or are made without actual knowledge of their falsity. 15 U.S.C. §§ 77z–2(c), 78u–5(c). Such statements include, but are not limited to, statements of future economic performance and management plans and objectives. 15 U.S.C.

§§ 77z–2(i), 78u–5(i). This "safe harbor" has much the same effect as the "bespeaks caution" doctrine, which provides that forward-looking representations that contain adequate cautionary language or risk disclosure protect a defendant from securities liability. See, e.g., *Plevy v. Haggerty,* 38 F.Supp.2d 816, 830 (C.D.Cal.1998).

tive device[s]" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Specifically, one may not "(a) ... employ any device, scheme, or artifice to defraud; (b) ... make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) ... engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

The elements of a section 10(b) or Rule 10b–5 violation are (1) the misrepresentation or omission of a material fact, (2) reliance, (3) scienter, and (4) damages. See *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir.1996) (en banc); *McCormick v. Fund American Companies, Inc.*, 26 F.3d 869, 875 (9th Cir.1994). "Scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). While recklessness has long been held to constitute scienter (see *Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir.1978)), in *Silicon Graphics* the Ninth Circuit clarified that recklessness "satisfies scienter under § 10(b)" only to the extent that it "reflects some degree of intentional or conscious misconduct." *Silicon Graphics*, 183 F.3d at 977.

## 2. Whether Plaintiffs' Complaint Sufficiently Identifies Defendants' Alleged Material Misrepresentations and/or Omissions

Rule 8(a) provides that any pleading "that states a claim for relief," such as a complaint, "must contain," *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV. PROC. 8(a)(2). Each allegation "must be simple, concise, and direct." FED.R.CIV.PROC.

8(d)(1). To state a claim for securities fraud, moreover, a complaint must specify "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1).

Defendants argue that plaintiffs' complaint fails to satisfy the PSLRA's pleading requirement because it is a "classic example of prohibited puzzle-pleading." [186] They note that plaintiffs quote extensively from public statements made by defendants throughout the class period, but do so without specifying the particular statements that are purportedly false or misleading. Defendants cite, as an example, paragraphs 29 through 34, which contain lengthy quotations from a Standard Pacific press release, conference call, and the company's 3Q05 Form 10–Q.[187] The five paragraphs comprise seven pages of text. Some of the phrases and sentences quoted are italicized and in bold typeface. The paragraphs containing the quotations are followed by an allegation that, for a variety of reasons, the "positive statements, assurances and forecasts made between October 27, 2005 and the issuance of Standard Pacific's 3Q05 10–Q were materially false and misleading when made." [188] Defendants assert that the complaint fails to identify any *specific* false or misleading statement, and that "[t]his style of pleading 'renders it exceedingly difficult to discern precisely which statements are alleged to be misleading.'" [189] See *In re Splash Technology Holdings, Inc. Securities Litig.*, 160 F.Supp.2d 1059, 1073 (N.D.Cal. 2001) (*Splash*).

■ The court agrees that the specific alleged false and misleading statements are not readily identified in plaintiffs' complaint. The pleading is 73 pages long, and has 145 numbered paragraphs. Paragraphs 29 through 103 appear under the heading, "Defendants' Class Period Misrepresentations." [190] All of the allegations in the section

186. Defendants Andrew H. Parnes and Stephen J. Scarborough's Notice of Motion and Motion to Dismiss Consolidated Class Action Complaint ("Def.'s Mot.") at 9.

187. See Complaint, ¶¶ 29–34.

188. *Id.*, ¶ 35.

189. Def.'s Mot. at 9.

190. See Complaint, ¶¶ 29–103.

follow the pattern described above: for a particular time period, plaintiffs cite one or more press releases, a conference call, and Standard Pacific's SEC filings; they then allege that the "positive statements, assurances and forecasts made" during the relevant period were false and misleading. The alleged reasons for the falsity include the following: that Standard Pacific's sales forecasts had no reasonable basis in fact; that its geographic diversification strategy was overstated; that the company's actual sales results were not meeting projections; that loan sales had dropped; and that the company had experienced a significant increase in cancellation rates in Florida.[191] The allegations regarding falsity do not tie these reasons to particular statements; instead, the reasons appear to apply generally to the statements quoted in the preceding paragraphs.[192]

Plaintiffs' complaint is similar to pleadings dismissed by other courts for failure to comply with the requirements of the PSLRA. In *Splash*, for instance, plaintiffs' complaint was 124 pages long, and 89 of the 184 paragraphs alleged defendants' "False and Misleading Statements During the Class Period." *In re Splash Technology Holdings, Inc. Securities Litig.*, 160 F.Supp.2d at 1073. Plaintiffs separated the class period into six time blocks, and described various occasions on which false statements were made during those periods; following their description of statements made during a particular period, plaintiffs identified "generally th[e] *types* of statements, from the preceding recitation of specific alleged statements, which they contend[ed] were false and misleading (without identifying specific paragraph(s) . . . contain[ing] those statements). . . ." They then "provide[d] a list of between five and nineteen 'reasons' that the statements were false at the time they were made (again, without identifying which alleged false statement(s) [were] belied by the facts stated in each 'reason')." *Id.* (emphasis original). The court noted that, to determine whether a particular statement was allegedly false, a reader had to look at the subsequent explanation paragraph and "wade through the

catalogue of statements, or fragments of statements, [set forth in] the preceding four paragraphs (each of which spans an entire page)." *Id.*

After determining that plaintiffs challenged a particular statement, or portion thereof, the court stated, the reader then had to "sift through" the various reasons provided to find out the basis for plaintiffs' belief that the statement was false or misleading when made. *Id.* at 1074. Plaintiffs employed a second approach in pleading the allegedly false statements as well, which was to quote long passages from various written analysts' reports and press releases, highlight portions of the quoted passages, and summarize in a paragraph several allegedly false and misleading statements, or types of statements, contained therein. *Id.*

The court found that plaintiffs had " 'left it up to defendants and the court to try to figure out exactly what the misleading statements [were], and to match the statements up with the reasons they [were] false or misleading.' " *Id.* (quoting *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 841 (N.D.Cal.2000)). It observed that " '[t]he predictable demands of reviewing such a complaint abuse judicial resources. When attorneys admitted to practice in Federal courts prepare complaints, neither the Court nor opposing counsel should be required to expend time and effort searching through large masses of conclusory, argumentative, evidentiary and other extraneous allegations in order to discover whether the essentials of claims asserted can be found in such a melange.' " *Id.* at 1074–75 (citing *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1251 (N.D.Cal.1998)). Rather, the court stated, " '[i]t is the duty and responsibility, especially of experienced counsel, to state those essentials in short, plain, and non-redundant allegations.' " *Id.* at 1075 (quoting *Wenger*, 2 F.Supp.2d at 1244). It noted that " '[i]n the context of securities class action complaints, courts have repeatedly lamented plaintiffs' counsels' tendency to place the burden [ ] on the reader to sort out the statements and

---

**191.** See, e.g., *id.*, ¶¶ 35, 43, 50, 62.

**192.** There is no indication that plaintiffs allege that only the italicized portions of the statements quoted are false and misleading.

match them with the corresponding adverse facts to solve the "puzzle" of interpreting Plaintiffs' claims.' " *Id.* (quoting *Wenger*, 2 F.Supp.2d at 1244).[193]

As a result, the court found that plaintiffs had "failed to set forth a 'short and plain' statement of their claims in violation of Rule 8(a) and [had] failed to make each allegation 'simple, concise and direct' in violation of [Rule 8(d)]." *Id.* It also held that, "in contravention of the PSLRA, plaintiffs [had] failed to craft a complaint in such a way that a reader can, without undue effort, divine precisely which statements (or portions of statements) are alleged to be false or misleading, and the reason or reasons why each statement is false or misleading." *Id.* It therefore granted defendants' motion to dismiss the complaint in its entirety. *Id.*

In their opposition, plaintiffs argue that the complaint adequately identifies the allegedly false and misleading statements.[194] They group defendants' false and misleading statements into three categories: (1) statements concerning sales and backlog; (2) statements regarding the company's financial strength based on diversification; and (3) omissions of material fact.[195] Plaintiffs cite scattered statements from the complaint's multitude of paragraphs that purport to fall within these categories, and explain why they believe them to be false or misleading.[196] The organization plaintiffs offer in their opposition brief does not cure the pleading deficiencies in their complaint. To the contrary, it highlights plaintiffs' failure to plead defendants' purportedly false and misleading statements with specificity as required by the PSLRA.[197] Accordingly, the

193. *Wenger* cites various cases in which courts handling in securities fraud actions have addressed this issue. See *Wenger*, 2 F.Supp.2d at 1244 (quoting *In re Oak Tech. Sec. Litig.*, No. 96–20552 SW, 1997 WL 448168, *5 (N.D.Cal. Aug. 1, 1997), and citing *In re GlenFed. Inc. Sec. Litig.*, 42 F.3d at 1544 (stating that such "puzzle-style" complaints are an "unwelcome and wholly unnecessary strain on defendants and the court system"); *May v. Borick*, CV 95–8407 LGB Ex, 1997 WL 314166, *8 (C.D.Cal. Mar. 3, 1997) ("[The complaint's] organization obfuscates rather than clarifies. Plaintiff's failure to address defendants' allegedly misleading statements individually, or even by category, and to state why each statement, or category of statements is misleading, renders this Court's task, and the task of the defendants excessively difficult"); *Shuster v. Symmetricom, Inc.*, C 94–20024 RMW PVT, 1997 WL 820967, *1 (N.D.Cal. June 25, 1997) ("The Complaint as it now stands is a rambling set of allegations which is almost impossible to effectively review.... Plaintiff sets forth lengthy quotes from various releases by defendants' officers and a securities analyst but does not make clear what portion of each quote constitutes a false presentation"); *Kane v. Madge Networks, N.V.*, 96–20652 RMW (N.D.Cal.1997) ("This maze-like style renders it almost impossible to determine the sufficiency of plaintiffs' explanations as to why the alleged statements were false or misleading when they were made"); and *In re Conner Peripherals, Inc.*, C 95–2244 MHP, 1996 WL 193811, *1 (N.D.Cal. Jan. 18, 1996) ("The complaint as written requires the court to excavate for actionable claims.... Judicial resources are too scarce and worthy cases too pressing for a case to spend its time rooting around in bloated complaints by experienced lawyers for a handful of actionable allegations")).

194. Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss ("Pl.'s Opp.") at 10.

195. *Id.* at 10–17.

196. *Id.*

197. By way of example, paragraph 90 of the complaint quotes from a Standard Pacific press release issued on April 11, 2007. (*Id.*, ¶ 90). Plaintiffs highlight certain phrases from the release, including statements that net new home orders for the first two months of the second quarter of 2007 were "nearly 20% below the Company's business plan for the two-month period"; that "[t]he overall decrease in orders was driven by continued weakness in Florida and Arizona, while order activity was up over 13% year over year in California"; and that "[o]rders were flat in the Carolinas, while down in Texas." (*Id.*). In paragraph 92, plaintiffs state that on June 14, 2007, Scarborough spoke at the Bank of America 2007 Homebuilders Conference and remarked, *inter alia*, that Standard Pacific had seen stabilization in some of its California markets and viewed Las Vegas as a good market going forward. (*Id.*, ¶ 92).

Plaintiffs assert in paragraph 93 that defendants' "positive statements, assurances and forecasts made in June 2007 were false or misleading when made because sales in the California market were not stabilizing as defendants represented." (*Id.*, ¶ 93). They further state that CW8 reported that incentives had been offered in communities throughout California; that according to CW2, Las Vegas was not a good market for Standard Pacific; and that CW9 and CW10 stated that decreased orders and sales were prevalent in Florida, and layoffs had begun in Tampa. (*Id.*).

court grants defendants' motion to dismiss with leave to amend. As a court in this district recently directed, the court recommends that plaintiffs "be clear and concise in identifying false statements and articulating the factual allegations supporting an inference that the statement is false or misleading. For each allegedly false or misleading statement, the Complaint should identify some facts suggesting that the statement is false or misleading, ... preferably in the same [paragraph] or a paragraph following the statement." See *Gold v. Morrice*, CV 07–931 DDP (JTLx) (C.D.Cal. Jan. 31, 2008) (attached as Exhibit 1 to defendants' motion to dismiss).[198]

Because the allegations of falsity are lumped together, it falls to the court and defendants to attempt to match the explanation of falsity with the allegedly misleading statements. It appears, for instance, that allegations regarding market destabilization in California are designed to show that Scarborough's statements regarding this topic at the Homebuilders Conference, as recited in paragraph 92, were false; it is not clear whether plaintiffs likewise intend the allegation to show the falsity of the highlighted statement in paragraph 90 concerning increased order activity in California. Similarly, because paragraph 90 makes no mention of Las Vegas, the court must assume that paragraph 93's allegations of poor performance in Las Vegas are addressed to Scarborough's statements in paragraph 92. It is not clear what the court should infer from plaintiffs' statements about declining sales in Florida, however, as the only highlighted statement in paragraph 90 that concerns Florida is that "continued weakness" there was contributing to Standard Pacific's overall decrease in orders. Given the multiple questions that arise, it cannot be said that plaintiffs' complaint clearly specifies "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1).

**198.** Cf. also *In re Metropolitan Securities Litig.*, 532 F.Supp.2d 1260, 1277–78 (E.D.Wash.2007) ("While the Court recognizes the hard work Plaintiffs' counsel no doubt expended in drafting the SCAC, the SCAC nevertheless fails to satisfy the 'short and plain statement' requirement of Rule 8. Like the complaint dismissed in *Wenger*, the SCAC repeats many allegations three or four times[,] ... does not indicate which among the [many] pages of statements are alleged to be false, does not follow each allegedly false statement with factors showing it was false [ ... and] merely throws the statements and the alleged 'true facts' together in an undifferentiated clump and apparently expects the reader to sort out and pair each statement with a supposedly relevant 'true fact.' ... Moreover, the SCAC's length and organization make it even more cumbersome and time-consuming than the complaints dismissed in *Splash* and *Wenger*. While the complaint in *Splash* was 124 pages, and that in *Wenger* 86 pages, the SCAC 'tips the scales' at 317 pages in length. It appears that the Plaintiffs, blessed with the wealth of facts disclosed in the Bankruptcy Examiner's report, felt the need to incorporate as many facts as possible into the complaint. The purpose of a complaint is not, however, to inform the opposing party of every fact underlying the plaintiff's claims. The proper time for such detailed revelation is discovery. A complaint need only set forth sufficient facts to notify the opposing party of the claims against it and the factual basis of those claims. Factual allegations will, of course, be lengthier and more detailed when a plaintiff's claims must be alleged with particularity. As explained below, however, even complaints alleging fraud must be more 'user-friendly' than the SCAC. The Plaintiffs will be permitted to amend their complaint in order to conform with the requirements of Rule 8. The Court recognizes that this task will be both challenging and burdensome. However, the American legal system places this burden on the party seeking relief, rather than the party responding to a claim. Nor is it appropriate for a trial court to effectively involve itself in the drafting process by puzzling out the details of a plaintiff's claims," citing *Wenger*, 2 F.Supp.2d at 1243); *Kelley v. Rambus, Inc.*, C 07–1238 JF, 2007 WL 3022544, *2 (N.D.Cal. Oct. 15, 2007) ("In [*In re Leapfrog Enters., Inc. Sec. Litig.*, C 03–05421, 2006 WL 2192116, *1 (N.D.Cal. Aug. 1, 2006) ], the court expressed 'concern that the manner which the 147–page consolidated amended complaint is arranged makes it difficult, if not impossible, to evaluate the pleadings and determine whether the requirements of the ·[PSLRA] are met.' This Court shares the same concern in the instant case. The heightened pleading standard is not an invitation to adopt a 'kitchen-sink' approach to a pleading. Indeed, in another context requiring heightened pleading, the Ninth Circuit has noted that '[a] heightened pleading standard is not an invitation to disregard [ ] Rule 8's requirement of simplicity, directness, and clarity,' " quoting *McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir.1996)); *Central Laborers Pension Fund v. Merix Corp.*, CV 04–826 MO, 2005 WL 2244072, *4 (D.Or. Sept. 15, 2005) ("Despite a voluminous 110–page complaint, Plaintiff fails to identify with particularity each allegedly misleading statement upon which Plaintiff's claims rest. While the complaint lists countless statements by the Merix Defendants, it does not identify which of these are allegedly false. For example, paragraph 60 of the complaint notes that Merix's January 6, 2004, Form 10–Q contained several statements. It does not state which of these statements, if any, were allegedly false. Portions of some of the statements cited in the complaint are written in boldface, with the possi-

### 3. Whether Plaintiffs' Complaint Adequately Pleads Scienter

### a. Standard for Pleading Scienter

As noted, " '[t]he PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter.' " *Middlesex Retirement System v. Quest Software Inc.*, 527 F.Supp.2d 1164, 1178–79 (C.D.Cal.2007) (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir.2002)). " 'The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading "fraud by hindsight." ' " *Id.* at 1179 (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1084–85).

In addition to pleading falsity adequately, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u–4(b)(2). "The Ninth Circuit has interpreted th[is] scienter pleading requirement as meaning that plaintiffs 'must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.' " *Middlesex Retirement System*, 527 F.Supp.2d at 1179 (quoting *Silicon Graphics*, 183 F.3d at 974). "The *Silicon Graphics* Court further clarified that 'recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct.' " *Id.* (quoting *Silicon Graphics*, 183 F.3d at 977). "The requisite recklessness must be an 'extreme departure from the standards of ordinary care, and ... present[ ] a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it.' " *Id.* (quoting *Silicon Graphics*, 183 F.3d at 984). "A plaintiff cannot proceed on pleadings averring scienter based on mere 'motive and opportunity' but instead must 'state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent.' " *Id.* (quoting *Silicon Graphics*, 183 F.3d at 979).

The Supreme Court recently elaborated on this "strong inference" standard for pleading scienter in *Tellabs*, 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179. "Agreeing with the standard in the Ninth Circuit, the Court held that 'courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss.... The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.' " *Middlesex Retirement System*,

---

ble implication that the bold portions constitute the allegedly false statements. However, Plaintiff's memorandum in opposition to Defendants' motion identifies only non-bold statements as examples of the complaint's 'specific statements made by the Defendants ... that were false and misleading.' Indeed, after reading Plaintiff's memorandum it is less clear whether Plaintiff is asserting that each and every statement cited in the complaint is false and misleading or, if less than all of the statements, which of the numerous statements form the basis of Plaintiff's claims.... 'In short, plaintiffs have left it up to defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading.' *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 842 (N.D.Cal.2000). As such, Plaintiff's complaint fails to satisfy the pleading requirements of the PSLRA. 15 U.S.C. § 78u–4(b)(1). In addition, the court cannot assess the materiality of any allegedly false statements without knowing the precise statements at issue. The court likewise cannot rely on Plaintiff's characterization of Defendants' statements to determine whether they are subject to the PSLRA's safe harbor for forward-looking statements, or whether Defendants acted with scienter in making those statements.... Accordingly, Plaintiff's fraud claims are dismissed with leave to re-plead" (footnotes omitted)). But see *In re Spiegel, Inc. Securities Litig.*, 382 F.Supp.2d 989, 1012 (N.D.Ill.2004) ("In paragraphs 46–106, the Complaint describes Defendants' schemes to defraud, such as offering credit primarily to sub-prime creditors under relaxed standards to artificially boost sales; overstating Spiegel's gains and understating its debts; manipulating the interchange rate to avoid trust trigger violations; and hiding the fact that trust trigger violations occurred. The Complaint next lists Defendants' false and misleading statements and explains why they are false and misleading. Paragraphs 168–208 then identify the corrective disclosures that advised the market of the fraud. Plaintiffs also added separate sections describing Defendants' violations of GAAP and KPMG's role in the fraud. With two exceptions, discussed below, the court finds that Plaintiffs' Complaint satisfies the procedural pleading requirements of

527 F.Supp.2d at 1179 (quoting *Tellabs*, 127 S.Ct. at 2509 (emphasis original)).

"Under the PSLRA 'when determining whether plaintiffs have shown a strong inference of scienter, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs.'" *Id.* (quoting *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002)). "However, the 'inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." ... [T]he inference of scienter must be more than merely "reasonable" or "permissible[,]" [however]—it must be cogent and compelling ... in light of other explanations.'" *Id.* (quoting *Tellabs*, 127 S.Ct. at 2510). "[A] 'complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs*, 127 S.Ct. at 2510) (emphasis added in *Middlesex*).

### b. Plaintiffs' Allegations of Scienter

Defendants contend plaintiffs have not pled scienter with the degree of particularity required under the PSLRA.[199] Although the court has determined that plaintiffs' pleading of false statements or omissions is deficient, the court must review the allegations as a whole to determine whether plaintiffs have adequately pled scienter. See, e.g., *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d at 842–43 (analyzing scienter after determining that complaint failed to plead falsity with particularity).[200]

Throughout the complaint, plaintiffs allege that defendants' positive statements, assurances, and forecasts regarding sales and backlog were false and misleading. They contend the following allegations raise a strong inference that defendants' statements were intentionally false or deliberately reckless: (1) backlog, sales, and earnings projections were based on internal sales reports that contained false data; (2) defendants knew that the geographic markets into which it was expanding were "already overheated" and at risk; (3) defendants certified in Standard Pacific's Forms 10–Q and 10–K that none of the information presented in those reports was false or misleading; (4) defendants' public statements concerned Standard Pacific's core business operations.[201]

As respects the alleged falsity of defendants' projections and forecasts, plaintiffs contend that defendants had "actual knowledge" of the statements' falsity because of the faulty data contained in the Cognos reports on which they were based.[202] The complaint states that, according to CW1, Standard Pacific sales reports, or "Cognos reports," were prepared on a weekly basis using sales data received from each of the company's divisions.[203] CW1 integrated the sales data into one weekly report that she distributed to various Standard Pacific executives, including Scarborough and Parnes.[204] The weekly sales reports contained not only divisional sales data, but also spreadsheets detailing land acquisitions, construction starts, completions, sales, and forecasts of sales projections for each division through the end of the fiscal year.[205] The information from the weekly reports was used to produce monthly sales reports, which was, in turn, used to prepare quarterly and year-end sales reports.[206] This information was the basis

Rules 8 and is neither unduly prolix nor confusing").

**199.** Def.'s Mot. at 20.

**200.** Plaintiffs' failure to plead specifically which statements were allegedly false or misleading makes it difficult to analyze whether the complaint adequately pleads that the statements were made intentionally or with deliberate recklessness. As a result, the court focuses in this order on the general categories of false statements plaintiffs will likely reassert in their amended complaint—i.e., statements and omissions re-

garding sales projections, backlog, and company performance.

**201.** Pl.'s Opp. at 25–29.

**202.** *Id.* at 25.

**203.** Complaint, ¶ 4.

**204.** *Id.*

**205.** *Id.*

**206.** *Id.*

for Standard Pacific's Forms 10–K and 10–Q, which were filed with the SEC.[207]

CW1 discovered in December 2005 that the company's 4Q05 sales data for some divisions listed sales for which no deposit had been received or escrow opened; deposits and open escrows ordinarily supported each division's sales projections.[208] She investigated, and discovered that some of the projections were wholly unsupported, specifically, those for San Antonio, Texas and Jacksonville, Florida, as they included sales for which escrows had been cancelled.[209] CW1 contends that throughout the class period, Standard Pacific consistently fell at least 25% short of sales forecasts, a fact of which defendants were aware.[210] She maintains that throughout 2006, "the variance between actual and projected sales grew larger, to where the projections were likely between 35% and 50% greater than what should have been forecast based upon real data." [211]

Plaintiffs argue that defendants' access to these internal reports creates a strong inference of scienter.[212] Plaintiffs are correct that "[t]he most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir.2004). In *Oracle*, plaintiffs asserted that "Oracle's forecasts regarding the third quarter (i.e., that the declining U.S. economy was not hurting its business and that Oracle would earn twelve cents per share and would see applications revenues grow 75% and database revenues grow 25%), as well as Oracle's statements that the 11i Suite is 'pre-integrated and fully interoperable out of the box' and that 'no systems integration is required'; were actionable." *Id.* To show scienter, plaintiffs alleged that Oracle maintained an internal database covering global information about sales of Oracle products and services, and that Oracle's executives actively monitored the database. *Id.* at 1231. As a result, they asserted, "Oracle must have been aware that it was not going to meet its sales projections earlier in the third quarter, and ... its statements to the contrary were therefore made with scienter." *Id.*

Evaluating the sufficiency of these allegations, the Ninth Circuit observed that, absent hard numbers or other specific information, general references to the existence of sales data and general assertions regarding what the data showed do not satisfy the pleading requirements of the PSLRA. *Id.* (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035–36 (9th Cir.2002)). The court noted, however, that plaintiffs had alleged hard numbers and made "specific allegations regarding large portions of Oracle's sales data," in that "[t]he Complaint contain[ed] specific statements from former employees and managers in various regions of the United States (and working in a number of different departments) testifying to a major slowdown in sales." *Id.* Together with highly suspicious stock sales, these facts led the Ninth Circuit to conclude that plaintiffs had pled defendants acted with the requisite scienter. *Id.* at 1234.

■ Here, plaintiffs plead that the Cognos reports contained detailed divisional sales data, and that the contents of those reports contradicted defendants' optimistic sales forecasts. They identify who produced the reports and how defendants came into possession of them. The specifics plaintiffs provide regarding the reports adequately plead their reliability, and are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness in basing their public statements regarding sales and backlog on the reports. See *id.* at 1230–31 ("Past securities fraud litigants have relied on the fact that corporations typically produce internal reports, and have alleged

207. *Id.,* ¶ 5.

208. *Id.,* ¶ 6.

209. *Id.*

210. *Id.,* ¶ 9.

211. *Id.*

212. Pl.'s Opp. at 26.

that such reports contained negative information without ever having seen any particular documents. At its worst, this strategy allowed plaintiffs to bring securities fraud suits with little more basis than the fact that the stock price had fallen. We have held that 'a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability.' [A] proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability," quoting *Silicon Graphics,* 183 F.3d at 984–85 (noting that the district court had taken judicial notice of five other securities class action complaints containing the same boilerplate allegations regarding "negative internal reports" included in the complaint at hand)). Compare *Kuehbeck v. Genesis Microchip Inc.,* C 02–5344 JSW, 2005 WL 1787426, *10 (N.D.Cal. July 27, 2005) ("[U]nlike in *Oracle,* Ms. Kuehbeck has not identified specific internal reports that would have provided Defendants with particularized and detailed information about Genesis' sales and whether they were declining, as a result of the alleged problems"); *In re Autodesk, Inc. Securities Litig.,* 132 F.Supp.2d at 844 ("Plaintiffs assert that defendants knew that sales of the R14 were declining because of the internal reports they reviewed. Plaintiffs refer generally to reports generated on a weekly basis by Autodesk's finance department. . . . Plaintiffs make no specific allegations, however, about the contents of the reports or about how the contents contradicted defendants' public statements. Moreover, plaintiffs do not explain how they know what was in the reports. Nor do they quote from the reports or provide any factual basis for their claim that such reports were issued. They merely allege that sales were declining, and that there were reports—implying that information regarding declining sales must have been contained in those reports. The allega-

tions in the CAC are insufficient in this regard because Rule 9 and the PSLRA require that plaintiffs provide details regarding how they obtained the reports, who produced the reports, and specifically what information the reports contained").

As the Supreme Court instructs, however, "[t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs,* 127 S.Ct. at 2510. Defendants argue that numerous facts in the complaint create a compelling inference of *nonfraudulent* intent.[213]

They note, for example, that the complaint alleges that as sales at Standard Pacific's various divisions fell short of forecasts, the company repeatedly lowered its delivery and earnings guidance throughout 2006 and into 2007.[214] On February 2, 2006, Standard Pacific reduced its delivery guidance for 2006 from 14,000 to 13,000 homes; on April 27, 2006, it reduced the delivery guidance further to 12,300 homes, and lowered its earnings guidance from $6.90 to $6.50 per share. On July 27, 2006, Standard Pacific reduced its delivery guidance from 12,300 to 10,400 homes, and its earnings guidance from $6.50 to $5.10–$5.40 per share. On October 26, 2006, it reduced delivery guidance further from 10,400 to 10,200–10,300 homes, and lowered its earnings guidance from $5.10–$5.40 to $4.20–$4.30 per share. Finally, on April 26, 2007, it reduced delivery guidance for 2007 from 8,700 to 8,150 homes, and its revenue guidance for 2007 from $3.3–3.2 billion to $3.1 billion.[215]

The complaint also alleges that Standard Pacific expressly advised investors that these

213. Def.'s Mot. at 21.

214. *Id.* at 23.

215. *Id.* at 16–17; Def.'s RJN, Exhs. K, L, M, N, P. The complaint also states that in early second

quarter 2006, "defendants directed Standard Pacific's divisions to revise their 2006 forecasts downward to reflect the declining market." (Complaint, ¶ 50).

reductions in guidance were due to deteriorating market conditions and slowing home sales. In the July 27, 2006 press release, for instance, Scarborough stated: "We are impacted by growing levels of both new and existing home inventories, a steadily increasing interest rate environment, reduced affordability and weaker homebuyer confidence. All of these conditions have resulted in lower sales rates and higher levels of cancellations which have given rise to a greater use of incentives and other forms of discounting." [216] In September 2006, the company reported that net new home orders for the first two months of third quarter 2006 were down 58%, "driven in large part by the continued increase in the Company's cancellation rate and further weakening of demand in many of the Company's larger markets." [217]

Defendants also allegedly warned investors that, although they had lowered expectations, *actual results might still fall short of projections.* In the October 26, 2006 press release, Standard Pacific stated that its guidance did "not reflect additional inventory impairment charges or write-offs on deposits and capitalized preacquisition costs for abandoned projects. Our regular quarterly project budget update and inventory impairment analysis could lead to additional charges if market conditions change or we are not able to achieve our projected absorption rates with our existing pricing structure. In addition, we continue to evaluate land controlled in our pipeline which could lead to additional deposit and cost write-offs." [218]

In a February 1, 2007 press release, Standard Pacific stated: "If general or local market conditions deteriorate further, or our competitors change their pricing strategies, we may have to further reduce home prices or adjust our discounts and concessions which may, in turn, trigger additional impairments." [219]

Defendants argue that rather than misleading the market as to the true state of the company, Standard Pacific "unambiguously informed investors that it was experiencing declines in sales, and that decreasing demand was likely to negatively impact future earnings." [220] Plaintiffs, having included these statements in their complaint, concede that defendants lowered guidance and projections, and noted declining sales. Consequently, it appears that the crux of plaintiffs' fraud claim is not that defendants flatly misrepresented the company's performance, but that they were deliberately reckless because they failed to lower their projections *enough*—i.e., to predict greater reductions in home deliveries and earnings.[221] The fact that defendants reduced earnings and home delivery guidance cuts against plaintiffs' claim that defendants acted with fraudulent intent. As no facts are pled supporting an inference that defendants selected the level of the reductions they announced fraudulently or with deliberate recklessness, the complaint suggests a plausible nonculpable explanation for defendants' conduct. *Tellabs,* 127 S.Ct. at 2510.

Specifically, plaintiffs have failed sufficiently to connect the rate at which defendants reduced their forecasts and projections to their allegation that the Cognos reports contained faulty sales data. Plaintiffs rely on CW1's assertion that Standard Pacific's *results* were consistently 25% under its projections, and her speculative statement that the projections were "likely" 35% to 50% greater than what should have been forecast.

Taken as a whole, however, plaintiffs' allegations do not give rise to a "strong inference" that, *at the time they made the statements,* defendants knew or should have

---

216. See Complaint, ¶ 52.

217. *Id.,* ¶ 65.

218. *Id.,* ¶ 66.

219. *Id.,* ¶ 76.

220. Def.'s Mot. at 17.

221. See, e.g., Complaint, ¶ 115 ("Partial revelations about the Company's declining health throughout the Class Period allowed some of the artificial inflation to come out of Standard Pacific stock, however, due to defendants' lack of full and complete disclosure, false assurances and continuing misrepresentations, Standard Pacific stock continued to trade at artificially inflated prices through the balance of the Class Period").

known that the state of affairs was much worse than they had acknowledged publicly. Cf. *In re Read–Rite Corp.*, 335 F.3d 843, 846 (9th Cir.2003) (" 'To meet this pleading requirement, the complaint must contain allegations of specific "contemporaneous statements or conditions" that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made,' " quoting *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir.2001)). In effect, by arguing that defendants' predictions and forecasts were not low enough, plaintiffs improperly attempt to allege "fraud by hindsight." [222]

Plaintiffs' allegations regarding defendants' SEC filings also fail adequately to plead scienter. Section 302 of the Sarbanes–Oxley Act requires the principal executive and financial officers to certify certain aspects of a company's Forms 10–Q and 10–K. 15 U.S.C. § 7241. Defendants signed Standard Pacific's SEC filings pursuant to section 302; plaintiffs contend this "provide[s] strong evidence that defendants were at least deliberately reckless in causing and permitting the fraudulent statements to be published." [223] Plaintiffs cite *In re Lattice Semiconductor Corp. Sec. Litig.*, CV 04–1255 AA, 2006 WL 538756, *18 (D.Or. Jan. 3, 2006), a case involving allegations of false statements in financial statements, as authority for their assertion that Sarbanes–Oxley certifications give rise to an inference of scienter. There, however, the company admitted that one of the individual defendants had made false accounting entries and plaintiff adduced information from confidential witnesses that he would not have done so without the approval of the company's officers. *Id.* at *18. Here, by contrast, such supporting allegations are absent from plaintiffs' complaint. See *In re Intelligroup Securities Litig.*, 527 F.Supp.2d 262, 289–90 (D.N.J.2007) ("[W]hile the issue of what impact a Sarbanes–Oxley certification has on a 10b–5 claim is a relatively novel question, the above-discussed holdings indicate that—as with allegations that defendants violated GAAP—allegations based on defendants' erroneous SOX certification cannot establish the requisite strong inference of scienter unless the complaint asserts facts indicating that, at the time of certification, defendants knew or consciously avoided any meaningful *exposure to the information that was rendering their SOX certification erroneous,*" citing *In re Watchguard Securities Litig.*, C 05–678 LR, 2006 WL 2927663, *9 (W.D.Wash. Oct.12, 2006); *In re Invision Technologies, Inc. Securities Litig.*, C 04–3181 MJJ, 2006 WL 538752, *7 n. 3 (N.D.Cal. Jan. 24, 2006); and *Lattice*, 2006 WL 538756 at *18); see also *Weiss v. Amkor Technology, Inc.*, 527 F.Supp.2d 938, 950 (D.Ariz.2007) ("SOX certifications may provide additional evidence of scienter if a plaintiff alleges that not only were the certifications false and misleading, but also that the defendants had actual knowledge of their false or misleading nature or were deliberately reckless in issuing such statements at the time," citing *Limantour v. Cray, Inc.*, 432 F.Supp.2d 1129, 1160 (W.D.Wash.2006)).[224]

---

**222.** At the hearing, plaintiffs asserted that, in addition to alleging that Standard Pacific's projections were overstated, they also alleged that the actual sales data reported was false. Plaintiffs contend that the facts alleged in the complaint support a strong inference of scienter with respect to false sales reports. Because plaintiffs failed to allege precisely which sales reports they contend were false, the court cannot presently determine whether they have adequately pled that false sales reports were made, and that they were made with the requisite scienter. The court's discussion regarding scienter, therefore, is limited to plaintiffs' allegations that forward-looking projections and earnings guidance were false and misleading.

**223.** Pl.'s Opp. at 27.

**224.** The court declines to address plaintiffs' argument that scienter may be inferred because "the falsehoods and concealed information related to Standard Pacific's core business and operations." (Pl.'s Opp. at 28). Plaintiffs cite *South Ferry LP No. 2 v. Killinger*, 399 F.Supp.2d 1121 (W.D.Wash.2005), in support of the proposition that " 'it may be inferred that facts critical to a business's core operations or an important transaction are known to a company's key officers.' " *Id.* at 1139 (quoting *In re Northpoint Communications Group, Inc. Sec. Litig.*, 184 F.Supp.2d 991, 998 (N.D.Cal.2001)). Despite this fact, "[p]laintiffs must show through sufficiently specific factual allegations that Defendants had knowledge, constructive or actual, of the data alleged to be contradictory to their statements. Thus, the showing is two-fold: (1) that there was information contradictory to the challenged statements, and (2) that Defendants knew or should have known this information by virtue of their roles at the company." *Id.*

As noted, in pleading scienter, "[t]he requisite recklessness must be an 'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it.'" *Middlesex Retirement System*, 527 F.Supp.2d at 1179 (quoting *Silicon Graphics*, 183 F.3d at 984). Plaintiffs have failed to satisfy this stringent pleading requirement, and defendants' motion to dismiss must be granted on this basis as well.[225] The court grants plaintiffs leave to amend, however, and recommends that for each alleged false or misleading statement, plaintiffs state particular facts giving rise to a strong inference of deliberate recklessness such as strongly suggests actual intent to deceive.[226]

### E. Sufficiency of Count II: Violation of Section 20(a) of the 1934 Act

Section 20(a) imposes joint and several liability on persons who directly or indirectly control a violator of the securities laws. The section provides:

"Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person ... is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

A prima facie case of control person liability requires evidence (a) that a primary violation of the securities laws occurred and (b) that defendant directly or indirectly controlled the person or entity committing the primary violation. See, e.g., *Paracor Finance*, 96 F.3d at 1161; see also *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440 n. 8 (9th Cir.1987) (plaintiffs must "prove that the controlled person ... violated a rule or regulation under the 1934 Act causing injury" to plaintiffs, citing *Christoffel v. E.F. Hutton & Co.*, 588 F.2d 665, 667–68 (9th Cir.1978)). Plaintiffs need not prove the individual defendant's scienter or "culpable participation" in the alleged wrongdoing. *Id.* (quoting *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir.1993)). Because the court has dismissed plaintiffs' section 10(b) and Rule 10b–5 claims, there is no primary violation on which to predicate section 20(a) liability. Consequently, the court dismisses plaintiffs' section 20(a) claim as well.

### F. Sufficiency of Count III: Violation of Section 20A of the 1934 Act Against Parnes

Plaintiffs assert insider trading claims against Parnes under § 20A of the 1934 Act, 15 U.S.C. § 78t–1(a), based on Parnes' sales

---

To the extent plaintiffs argue that an inference of scienter arises because defendants' representations concerned core business operations, the court declines to sift through the allegations of the complaint regarding matters as varied as layoffs in Tampa, low market interest in Las Vegas, and slashing of prices in San Antonio to determine which of the alleged misrepresentations and omissions concerned core business operations and which did not.

**225.** Because plaintiffs' complaint must be dismissed for failure to plead falsity and scienter, the court need not address defendants' arguments that plaintiffs have failed adequately to plead loss causation and that the alleged misstatements are forward-looking and protected by the PSLRA's "safe harbor" provisions.

**226.** See *In re Autodesk, Inc. Securities Litig.*, 132 F.Supp.2d at 846 (instructing plaintiffs when amending complaint to

"[s]tate particular facts giving rise to a strong inference of a degree of recklessness that strongly suggests actual intent to deceive;
a. If plaintiffs allege that defendants received or possessed documents or information that was at odds with the alleged false or misleading statement, state all the relevant facts supporting this belief;
b. If plaintiffs allege that the information was contained in documents, state the title, date, and contents of such documents (with particularity), the identity of the person or persons who drafted such documents, the identity of the person or persons who reviewed such documents, how plaintiffs learned of the existence of the documents, and how plaintiffs know that defendants received these documents;
c. If plaintiffs allege that the information was in a form other than written, state the source or sources of their information (how they learned of this information allegedly possessed by defendants) and how they know that the defendants possessed this information").

of Standard Pacific stock during the class period. Section 20A, governing liability to contemporaneous traders for insider trading, provides in relevant part:

"Any person who violates any provision of this title ... or the rules or regulations thereunder by purchasing or selling a security *while in possession of material, nonpublic information* shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the ... sale of securities that is the subject of such violation, has purchased ... securities of the same class." 15 U.S.C. § 78t–1(a) (emphasis added).

Plaintiffs allege that during the class period, Parnes occupied positions within Standard Pacific that gave him access to confidential information concerning the company, its operations, finances, financial condition, and future prospects.[227] They maintain that Parnes had a duty to refrain from trading unless he publicly disclosed material adverse facts known to him, and that, in derogation of that duty, he sold Standard Pacific common stock at the time plaintiffs and other class members were purchasing the stock.[228] On November 30, 2005, for instance, Parnes sold 4,000 shares of Standard Pacific stock, while lead plaintiff Plumbers Local No. 98 purchased 7,400 shares.[229]

Defendants argue that the complaint fails to state a § 20A claim against Parnes for the same reason it fails to state a claim under § 10(b).[230] The court agrees. The Ninth Circuit has stated that to prevail on a claim for violation of § 20A, "plaintiffs must first allege a violation of § 10(b) or Rule 10b–5." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n. 15 (9th Cir.2002) (citing *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993)); *see also Teachers' Retirement System of LA v. Hunter*, 477 F.3d 162, 169, 189 (4th Cir.2007) (affirming the district court's dismissal of plaintiffs' claims under §§ 20(a) and 20A of the Exchange Act following dismissal of a claim under § 10(b) and Rule 10b–5, because the §§ 20(a) and 20A claims

were dependent upon liability under § 10(b) and Rule 10b–5); *Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir.2007) ("The term 'violates' in Section 20A is crucial. Claims under Section 20A are derivative and therefore require an independent violation of the Exchange Act," citing *Lipton*, 284 F.3d at 1035 n. 15; *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir.1999); *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir.1994); and *In re VeriFone Sec. Litig.*, 11 F.3d at 872).

As plaintiffs have failed to plead falsity and scienter with particularity, they have likewise failed to establish that Parnes has committed an independent violation of the 1934 Act. The court therefore grants defendants' motion to dismiss with leave to amend.

## III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted. Plaintiffs may file an amended complaint within forty-five (45) days of the entry date of this order.